419 So.2d 881 (1982)
STATE of Louisiana
v.
Gerard C. EDWARDS.
No. 82-KA-0207.
Supreme Court of Louisiana.
September 7, 1982.
*884 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Harry F. Connick, Dist. Atty., Louise Korns, Joseph Meyer, Jr., Asst. Dist. Attys., for plaintiff-appellee.
John M. Lawrence, Orleans Indigent Defender Program, New Orleans, for defendant-appellant.
DIXON, Chief Justice.[*]
The defendant was convicted of the first degree murders of Gilbert George and his sister-in-law Joy George in their apartment on February 28, 1978. The jury, unable to agree on a death sentence, recommended life imprisonment without benefit of probation, parole or suspension of sentence, and the defendant was sentenced accordingly.
At about 1:00 a. m. on February 28 the defendant went to the George apartment to purchase drugs. When he arrived he met three others on the front porch who were also interested in making a purchase. The four were admitted to the apartment by Gilbert George. Willie George, the five *885 year old son of Joy George, was sleeping in a fold-away bed in the living room of the small apartment, and Joy was asleep in the bedroom.
At some point the transaction developed into an armed robbery of the drugs, money, jewelry and guns in the apartment. Gilbert was shot in a scuffle with one of the robbers. Joy was shot as she trembled in bed. Willie was spared.
The defendant stayed with the others for several days around New Orleans until they all left for California.
Assignment of Error Nos. 1, 4 and 10
By these assignments the defendant contends that the trial judge erred in denying his Motion to Suppress his oral statement of May 6, 1978 and his written statement of May 10, 1978. The defendant further argues that the trial court erred in denying his Second Motion to Quash (Arrest). While the defense argues that the statements were involuntarily given, the essence of the argument is that the statements were the fruits of an illegal arrest and are therefore inadmissible.
Prior to the murders of the Georges, the defendant had been charged with aggravated battery, but had agreed with the police that if he testified in the murder trial of Wendell McDonald, the charge against him would be dropped. The defendant in fact testified in that trial, which ended in a mistrial. He was freed on a material witness bond guaranteeing his testimony at the new trial and the charge was dropped.
In early March, 1978, shortly after the Georges' murders, the defendant left the jurisdiction. The police aided by Ms. Norma Jean Berry, learned that he had gone to California. According to their information, the defendant left Louisiana to avoid testifying against Wendell McDonald.[1]
In mid-April of 1978, Detective Venezia, accompanied by Detective Pierce, flew to Los Angeles with a material witness warrant, C.Cr.P. 741 and 743, for the purpose of bringing back the defendant for the re-trial of Wendell McDonald. Detective Venezia, who was handling the McDonald case, was required by police procedures to have another officer along on the trip. Since his partner was unable to go, Venezia and his commander reviewed a list of the officers in the platoon and selected Detective Pierce as he was the only available officer. Detective Pierce, who happened to be investigating the murder of the Georges, was telephoned that morning for an afternoon flight.
The officers were informed in Los Angeles that the warrant could not be executed because, under California law, a witness could not be held for three weeks, which was the length of time before the trial. The officers then phoned New Orleans about the problem and the aggravated battery charge was revived and teletyped to Los Angeles. They then proceeded, with a Los Angeles officer, to the apartment where the defendant was staying. According to the officers, the defendant was presented with the choice of returning with them voluntarily as a material witness, or being arrested on the aggravated battery charge and facing extradition. Their testimony was that the defendant agreed to come along voluntarily to get the matter over with.
According to the defendant, the New Orleans officers entered the apartment in Los Angeles and searched for him until they found him hiding in the bathroom, at which point he was handcuffed. This testimony is supported by Ms. Rosalyn Damond, the occupant of the apartment, who testified that the defendant did not voluntarily accompany the officers. She later called the police station and was told that he had never been booked. Her testimony did not refer to any discussions between the defendant and the officers.
*886 After the defendant was found in Los Angeles, he was taken to a police station where he was informed of his rights because there was the possibility that he might be arrested for aggravated battery. He was therefore aware that he had the right to counsel, but he did not exercise it. The officers testified that no promises, inducements or threats were made to secure his compliance in returning. The officers also testified that all the defendant ever had to do was to say that he had changed his mind about going to New Orleans, at which point they would have had him arrested on the aggravated battery charge and begun extradition proceedings.
There is no documentary evidence that the defendant returned voluntarily with the officers. The two New Orleans officers and the Los Angeles officer each testified that the defendant wrote and signed a statement that he was voluntarily agreeing to accompany the officers back to New Orleans, where he was to be detained until after he testified in the Wendell McDonald trial. According to the officers' testimony, the purpose of securing the waiver was to prevent the defendant from objecting to the return to New Orleans at any point during the trip. All of the officers witnessed and signed the waiver. At the time of the trial the waiver could not be located. As to where the paper might be, Detective Venezia testified that his concern was with the case in which the defendant was to testify, and that after the defendant was safely in New Orleans, there was no longer any need for the statement, and that he probably had thrown it out.
The defendant denied that he signed any waiver of extradition, insisting that the only paper he signed was the receipt of his property. He testified that he was not aware that he was entitled to speak to a lawyer and that he would have requested one if he had known. He also stated that he would not have waived extradition, and claimed to have questioned one of the officers about extradition proceedings. He never felt that he was free to leave once he was taken from the apartment, but he did know that he was returning to New Orleans to testify in the McDonald trial and not to stand trial himself for the murders.
The defendant was taken to a holding cell at the Los Angeles airport until the plane was ready to leave. He was not handcuffed on the airplane. Upon his return to New Orleans, he was arrested on the material witness warrant. At the time the defendant was returned from California, he was not charged with the double murder, but he was under suspicion. Detectives Venezia and Pierce knew that the defendant was being investigated but this was not revealed to the defendant.
On May 6, 1978 the McDonald trial was in progress. The defendant and Detective Venezia were sitting in adjoining rooms in the district attorney's office under sequestration orders waiting to testify. The defendant called to Detective Venezia that he wanted to talk to him. Venezia went to the other room and told him that they could not discuss the case. The defendant explained that it was not about the McDonald case; that he was in some kind of trouble. Venezia asked him what the trouble was, and the defendant proceeded to give a statement concerning the murders of the Georges. The defendant and Detective Venezia were the only ones present at the time.
That evening the defendant was arrested at parish prison and booked on charges of armed robbery and accessory after the fact of murder.
On May 10, 1978 a written question and answer statement was given by the defendant to Detective Pierce in the presence of Detective Venezia and the secretary in the homicide office. The defendant was informed of his rights and signed a waiver form before making the statement.
The defendant contends that the evidence shows that he was threatened by the police and tricked by them into returning to Louisiana. The substance of the threat was that if the defendant did not return voluntarily, the aggravated battery charge would be used to hold him in California until he could be extradited to Louisiana. The essence of the trick was that the defendant *887 was not told that he was a suspect in a murder when that fact was known to the detectives.
As set forth in State v. Bouffanie, 364 So.2d 971, 973 (La.1978): "Before a confession or inculpatory statement can be introduced in evidence the State must prove affirmatively and beyond a reasonable doubt that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises...." R.S. 15:451; C.Cr.P. 703(C). There must be an element of compulsion in order to render a statement involuntary. State v. White, 329 So.2d 738 (La.1976).
While the defendant might have felt some compulsion to return to Louisiana under threat of prosecution, there was no compulsion which made the statements given several weeks later involuntary. The reason for the defendant's return to Louisiana was totally unrelated to the incidents in which he confessed involvement. He was not questioned by the police about the Georges' murders or even advised that he was under suspicion. Rather, he voluntarily approached Detective Venezia on May 6 and made his statement. After his arrest he made essentially the same statement, with full awareness of his constitutional rights, to Detective Pierce on May 10 so that it could be recorded.
The defendant contends that his statements should have been suppressed because he was illegally arrested in California and that nothing he did after his return to Louisiana was voluntary. Essentially, defendant's argument is that his statements were "fruits" of an illegal arrest.
On this record, it appears that the defendant voluntarily waived formal arrest and extradition proceedings in California, and that he enjoyed no immunity from arrest once back in Louisiana under subpoena issued under the interstate witness compact (C.Cr.P. 741 and 743) as the warrant was not executed in California. However, this does not end the inquiry. When the officers presented the defendant with the option of returning with them voluntarily or fighting extradition, they made it clear that they intended to take him back to New Orleans with them, one way or the other. In State v. Sherer, 354 So.2d 1038, 1042 (La.1978), this court observed that: "... It is the circumstances indicating intent to effect an extended restraint on the liberty of an accused, rather than the precise timing of an officer's statement: `You are under arrest,' that are determinative of when an arrest is actually made...." The clear inference to be drawn from the circumstances is that the defendant's liberty was to be restrained, and that he was never "free to walk away" after the officers found him. To the contrary, the officers made sure of this by having the previously nolle prossed aggravated battery charge revived and ready in the event that the defendant declined to voluntarily accompany them back to Louisiana.
Nevertheless, once Venezia and Pierce had the defendant back in the jurisdiction, they formally arrested him as a material witness pursuant to a warrant that represented a prior judicial determination that the defendant was in fact a material witness and that there were "... good grounds to fear that said witness may depart or be taken from the jurisdiction of the court ..." R.S. 15:257. Therefore, even assuming that the defendant's detention in Los Angeles and removal to Louisiana were illegal, the subsequent arrest and detention under an apparently valid material witness warrant may have sufficiently attenuated any taint of the subsequent statements by the prior illegal seizure. State v. Tokman, 412 So.2d 561 (La.1982); State v. Leatherwood, 411 So.2d 29 (La.1982).
An illegal arrest does not prohibit the state from prosecuting a defendant or using against him evidence that has come to light subsequent to the arrest. For the exclusionary rule to apply, there must be a causal connection between the illegal arrest and the evidence. State v. Grogan, 373 So.2d 1300 (La.1979); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).
*888 Whether an inculpatory statement is causally connected to an illegal arrest must be answered on the facts of each case:
"... The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct are all relevant...." Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416, 427 (1975)
In this case the defendant initiated the conversation in which his oral statement was made and was given the Miranda warnings before the written statement was made. Concerning the timing of the statements relative to the arrest, the record does not disclose the exact dates of the trip to California, though the officers and the apartment occupant both testified that the defendant left with the officers on a Sunday in mid-April, 1978. It was also established that the trip was approximately three weeks before the trial was scheduled, and that the first statement on May 6, 1978 was made as the defendant was waiting to be called as a witness. Clearly three weeks is not an insufficient time for the taint of the original illegal arrest (if it was illegal) to have become attenuated. In addition, the defendant was legally arrested upon his return to New Orleans in mid-April as a material witness and again on May 6 following his oral statement and the statement of Ms. Norma Jean Berry given on May 5 (see Assignment of Error No. 17). The officers had a valid reason for going to California to bring back the defendant, as he was a material witness in another trial, and it was not until after they arrived in Los Angeles that they learned that they might not be able to accomplish their mission with only the material witness warrant. The defendant does not argue that the officers did not have probable cause to have him arrested on the aggravated battery charge if he did not return voluntarily with the officers.
The admissibility of an inculpatory statement is a question for the trial judge and his conclusions as to the credibility of the witnesses testifying as to voluntariness will not be disturbed unless unsupported by the evidence. State v. Cobbs, 350 So.2d 168 (La.1977); State v. Stevenson, 374 So.2d 1189 (La.1979). The trial judge's ruling that the statements were admissible is supported by the evidence and does not constitute reversible error. There was also no error in the trial judge's denying the defendant's motion to quash the arrest.
These assignments of error lack merit.
Assignment of Error No. 2
By this assignment of error, the defendant challenges the identification made by Willie George. Defendant's argument is that the in-court identification should have been suppressed because it was tainted by the out-of-court identification.
On the night of the crime, five year old Willie was sleeping in a fold-away bed in the living room of the small apartment. Lights were on in the kitchen, bathroom and in his mother's bedroom, the only other rooms in the apartment. Willie testified that he was awakened by a gunshot and saw two men standing there in the hallway, which was illuminated by light from other rooms. He testified that he viewed the men for "a full minute" until they left through the kitchen door.
Willie was brought to the police station to view a lineup at which the defendant and the defense counsel were present. As Willie was late in arriving, the police took a photograph of the lineup. When Willie arrived, the full lineup was reassembled, at which Willie positively identified the defendant (and another defendant who was tried separately). While the testimony is unclear as to when Willie saw the photograph (Willie testified that it was the same day while the police testified that the photograph was not developed until one or two days later), it is clear that he did not see the photograph until sometime after the identification had been made. The manner in *889 which the physical lineup was conducted was not in any way suggestive, and was not tainted by the later viewing of the photograph.
This assignment lacks merit.
Assignments of Error Nos. 3 and 8
The defendant contends that it was error for the trial court to deny his first motion to quash based on the unconstitutionality of the first degree murder statute, R.S. 14:30, and on the trial court's allowing the state nine challenges for cause under C.Cr.P. 798, which had the effect of giving the state more peremptory challenges than it was allowed and causing jury bias with respect to defendant's guilt.
The imposition of the death penalty for the crime of first degree murder does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution of the United States, nor does it constitute cruel, excessive or unusual punishment in violation of Art. 1, § 20 of the Louisiana Constitution. State v. Myles, 389 So.2d 12 (La.1979).
C.Cr.P. 798(2), which provides for challenges for cause of a juror who makes it clear that he has conscientious scruples against the infliction of capital punishment such that he would automatically vote against the death penalty or be prevented from making an impartial decision regarding guilt, has been upheld in this court as within the rule of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). State v. Miller, 391 So.2d 1159 (La. 1980); State v. Berry, 391 So.2d 406 (La. 1980), cert. denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981). In this case the trial judge excused eight jurors based on their answers during voir dire examination that they could under no circumstances consider the death penalty. Review of the record shows that the trial judge was correct in his rulings as to each juror so excused. The excusing of eight jurors does not unconstitutionally bias a jury with respect to defendant's guilt, or deny the defendant the right to be tried by a jury representing a cross section of the community. See State v. Volson, 352 So.2d 1293 (La.1977) (ten prospective jurors excused) and State v. Roberts, 331 So.2d 11 (La.1976), reversed with respect to imposition of death sentence and remanded, 431 U.S. 633, 97 S.Ct. 1993, 52 L.Ed.2d 637 (1977), on remand, 350 So.2d 130 (La.1977) (twenty-five veniremen opposed to death penalty excused).
The ninth juror excused for cause to which the defendant objected answered that she would be unable to consider testimony from a five year old child:
"BY THE COURT:
Q Ma'am, you are saying, I think you said it a number of times, let me be sure, because of the age and the mental development of the child, you would not consider that testimony?
A I would not.
Q In that case you could not accept all of the evidence?
A I could not.
Q If I give you the law, the law as to evidence, you would exclude all of the evidence of the five year old?
A Yes, sir.
BY THE COURT:
Based on your answers, I excuse you for cause."
The trial judge has much discretion in determining the qualifications of jurors to hear a trial. C.Cr.P. 797; State v. Labostrie, 358 So.2d 1243 (La.1978); State v. George, 346 So.2d 694 (La.1977).
In State v. Murray, 375 So.2d 80, 83 (La.1979), this court was faced with a similar situation:
"In the instant case, in view of the testimony of two prospective jurors that under no circumstances would they believe the testimony of a homosexual, we are satisfied that the trial judge did not abuse his discretion in sustaining the state's challenge for cause of these prospective jurors...."
We find the trial judge's action of excusing a prospective juror who could not accept the testimony of a five year old child squarely within the holding of State v. Murray, supra, *890 and well within the discretion vested with a trial court judge.
As none of the nine challenges for cause objected to by defendant were improper, the state was not afforded more peremptory challenges than those to which it was entitled.
These assignments of error are without merit.
Assignments of Error Nos. 5, 6 and 12
The defendant argues that the trial court erred in denying his Motion for Private Medical/Psychological Evaluation by defendant's medical expert of five year old Willie George (six years old at the time of the trial) to determine his competency as a witness for the state. The defendant further argues that the trial court erred in admitting his testimony because the child was too young to testify as a competent witness, and that the testimony given was contrary to what the state had provided to the defendant in response to a request for exculpatory evidence.
The proper test for determining the competency of a young witness is set forth in R.S. 15:469, which provided:
"Understanding, and not age, must determine whether any person tendered as a witness shall be sworn; but no child less than twelve years of age shall, over the objection either of the district attorney or of the defendant, be sworn as a witness, until the court is satisfied, after examination, that such child has sufficient understanding to be a witness."
The trial judge is vested with wide discretion in determining competency, and on appeal his ruling is entitled to great weight as he had the advantage of seeing and hearing the witness. State v. Francis, 337 So.2d 487 (La.1976).
Willie George was called to testify at both the hearing on the motion to suppress the identification and at trial. On both occasions he was questioned by the trial judge about his schooling, what church he attended, where he lived, and especially what it means to tell a lie. Willie answered that "if you tell a lie, God will punish you," and he understood that he was to tell the truth.
The defendant had requested a psychological examination of Willie to be certain that the boy was not in an altered mental state after witnessing the murder of his mother and uncle; that he wasn't in a "fantasy land" making him unable to accurately remember the details of the crime. The defendant contends that inconsistencies in Willie's testimony indicate the examination was needed.
The trial judge ruled on the defendant's motion for the examination after Willie had testified at the hearing on the motion to suppress Willie's identification. In denying the examination, the trial judge stated:
"... I have listened to the witness; and I saw the witness, and I am familiar with his demeanor and the manner in which he handled himself on the witness stand, and in conversation that I have had with him in preparing him in the sense to make sure that he did understand, that he did have to tell the truth, in my observance I don't think it's necessary, and I'm not going to permit it."
It is precisely this opportunity of the trial judge to acquaint himself with the witness that affords great weight to his decisions on the competency of witnesses.
The defendant points to the following inconsistency in Willie George's trial testimony about what he actually saw as indicating that the witness was incompetent. After establishing that he had been awakened by a single gunshot, that it was short distance from his bed in the living room to the hallway, and that there were lights on in the apartment, Willie testified on direct examination as follows:
"Q Okay. Now, when you woke up, what did you see?
A Two men.
Q And where were they?
A Standing in the hallway.
Q And what were they doing?
A They was telling my uncle to give them the jewelry.
Q And what diddid you hear anything your uncle said?

*891 A He say he didn't have no jewelry.
Q And what happened after that, Willie?
A Then, they started shooting at him.
Q Did you see this?
A Yes.
Q How many men were there?
A Two.
... (Conference ensues)
Q Now, after you said you saw the shooting, or you heard the shooting?
A I saw it.
Q Now, at that time, did you see guns firing, or did you just hear some noise?
A I heard some noise.
Q Now, after you heard this noise, when these people were finished talking to your uncle, what did the men do?
A They went out the kitchen door."
There was no further testimony at trial concerning the events in the George apartment before the men left.
Taken as a whole, Willie's testimony is not inconsistent. When asked general questions about whether he saw the "shooting," Willie responded that he had seen it, but when asked the specific question about whether he saw the guns firing, he answered that he didn't actually see that part of the "shooting." This indicates more of a misunderstanding about the scope of the question rather than any inability to recall the events. It is clear that Willie watched the men as the shots were fired and he heard the shots, though he did not see the guns firing.
The trial court was correct in allowing the testimony of Willie George and in denying defendant's motion for a medical psychological examination.
The defense next argues that the testimony of Willie George was inconsistent with the response of the state to defendant's motion to compel disclosure of evidence that may be favorable to the defendant, and therefore the defendant should have been granted a mistrial because of the state's erroneous disclosure.
In explaining his motion to the court, the defense counsel stated that:
"... the basis of the request is that, I understand the evidence will show that Willie George was asleep at the time of the incident, and woke up, did not see the actual gun fire; and I would like to know if a statement to that effectthat he did not actually see Gerard Edwards perpetrate this offensewas made, ... that Gerard Edwards did not shoot anyone
..."
The state's reply was:
"It is my understanding, Your Honor, that [defense counsel] is correct that the young man was sleeping, and was awakened by the gun fire; and it is my understanding, and I will state for the record that the statements would indicate that he in fact did see the two parties inside the house immediately after the murders took place; ..."
The evidence that came out at trial was not favorable to the defendant in that Willie did not testify as to which of the two men had done the shooting, and could not say that it was not the defendant, since he did not see the actual gun fire. In terms of the request made by the defense, the answer of the state was satisfactory and consistent with the testimony of Willie George. The trial judge was correct in denying defendant's motion for a mistrial on this basis.
These assignments lack merit.
Assignment of Error No. 7
The defendant maintains by this assignment that the trial court erred in not allowing the defendant to call as witnesses before the jury two codefendants being separately tried. Out of the presence of the jury, these defendants refused to answer questions concerning the night of the murders of the Georges by invoking their rights under the Fifth Amendment. The contention is that the defendant has a right to force these witnesses to invoke that right before the jury and have the trier of fact draw an inference. The defendant's reasoning is that the prosecution is able to force the testimony of persons involved in crimes through the granting of immunity or reduction of charges, and due process requires *892 that the defendant be recognized as having a counterbalancing right, such as requiring witnesses to take the Fifth Amendment before the jury or allowing a possibility of judicial immunity.
The Fifth Amendment to the United States Constitution, made applicable to the states in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), in pertinent part, provides:
"No person ... shall be compelled in any criminal case to be a witness against himself."
and the Louisiana Constitution, Art. 1, § 16 (1974), states:
"No person shall be compelled to give evidence against himself."
Where the privilege against self-incrimination is invoked by a witness, there must be reasonable cause to apprehend danger from a direct answer, Hoffman v. United States, 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118, 1124 (1951), and the privilege may be asserted only with respect to particular questions. State v. Wilson, 394 So.2d 254 (La.1981); In re Parker, 357 So.2d 508 (La. 1978).
This court has, however, recognized certain limited exceptions to the requirement that the witness be presented to the jury to invoke the privilege against self-incrimination in response to each question. These instances are characterized by the position of the witness and the nature of the question such that "... an answer or explanation of a refusal to answer any question posed could result in an injurious disclosure...." State v. Coleman, 406 So.2d 563, 566-67 (La.1981). See State v. Darby, 403 So.2d 44 (La.1981), cert. denied ___ U.S. ___, 102 S.Ct. 1022, 71 L.Ed.2d 308 (1982); State v. Wilson, supra.
In this case both of the witnesses that the defendant sought to call were charged with first degree murder for the same crime as that charged to the defendant. Neither had yet been tried. Clearly there was reasonable danger that direct answers to questions concerning the events of the night of the murders could be injurious to them, entitling them to the Fifth Amendment's protection. Hoffman v. United States, supra.
It is equally clear that questions concerning the night of the murders asked of others charged with the offense along with the defendant would place those witnesses in a position where a refusal to answer or an explanation of that refusal could result in injurious disclosures. State v. Coleman, supra. These witnesses were called to the stand out of the presence of the jury where each claimed Fifth Amendment protection. Once the trial judge determined that they would refuse to answer any question concerning the murders, it was proper for him not to allow the witnesses to be called before the jury. State v. Johnson, 404 So.2d 239 (La.1981); State v. Day, 400 So.2d 622 (La.1981); State v. Berry, 324 So.2d 822 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976).
On this record it is clear that the defense was aware that the witnesses would not offer any testimony favorable to the defendant once it was determined that the privilege would be invoked, and that the defense wished to call these witnesses solely for the purpose of having them invoke their privilege in front of the jury. In State v. Berry, supra at 830, this court held:
"It is improper conduct for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege. American Bar Association Standards of Criminal Justice, Relating to the Prosecution Function, Standard 5.7(c), and Relating to the Defense Function, Standard 7.6(c) (1971). [See ABA Standards of Criminal Justice 3-5.7(c) and 4-7.6(c) (2d ed. 1980) for standards as renumbered].
As the commentaries to these standards indicate, claims of privilege are preferably determined outside the presence of the jury, since undue weight may be given by a jury to the claim of privilege and due to the impossibility of cross-examination as to its assertion. (The commentaries also note the impropriety of either *893 counsel arguing any inference from the failure of another to call a witness, if the failure to do so is known to be based on the witness's claim of privilege.) For similar reasons, the courts have uniformly rejected a defendant's claim of error based upon the denial of his request that a witness assert his claim of privilege before the jury. See United States v. Lacouture, 495 F.2d 1237 (CA 5, 1974), and decisions therein cited. See also Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963)."
The defendant argues in brief that the state has an unfair advantage over defendants in that it may, through a grant of immunity, compel the testimony of witnesses favorable to the state's case, while neither the defendant, nor the court on his behalf, has any such power. The defendant contends that there is potential for abuse by the state in that it may charge others involved with crimes to prevent them from being available to the defendant as witnesses (since they would then claim the privilege against self-incrimination). In this case, one of the witnesses that defendant sought to call before the jury, Sylvia Fleming, was charged with first degree murder of the Georges though the state never contended that she was actually one of the killers. After her husband, Kenneth Fleming, was found not guilty, she pleaded guilty to a lesser offense and was not prosecuted for first degree murder. The defendant contends that this was overcharging and resulted in her being unavailable for him to call as a witness.
This record does not support a finding that Sylvia Fleming was charged with first degree murder for any other purpose than to prosecute her for the murder of the Georges. According to the defendant's statement, Sylvia was the planner and driving force behind the robbery that led to the murders. We thus find no abuse by the prosecution that impaired the defendant's right to present witnesses on his behalf.
The defendant further argues that the trial judge should have the power to grant immunity to witnesses where he finds it necessary for a fair trial. Though this court is not unanimous on this issue, it has not recognized any authority by which a trial judge may grant immunity to witnesses to secure their testimony for a defendant. See State v. Mattheson, 407 So.2d 1150 (La.1981) and cases cited therein.
A proper balance between the prosecution and the defense does not require that identical rights with respect to each issue or trial aspect in the course of prosecution be accorded both the prosecution and the defense. Each is accorded rights, powers and opportunities consistent with the burden of each side, the function of each side and consistent with fairness.
This assignment of error is without merit.
Assignment of Error No. 9
The defendant contends that the trial court committed reversible error in denying his timely motion for a mistrial, or at a minimum an admonition to the jury, because of an answer offered by Detective Venezia which the defendant claims referred to other crimes of the defendant.
After establishing that Detective Venezia was with the homicide unit of the New Orleans Police Department, Detective Venezia testified as follows:
"Q Officer Venezia, I direct your attentionofficer, did you have occasion to participate in the investigation of a murder of one, Joy George, and one Gilbert George?
A Yes, I did.
Q And in fact, officer, did you have occasion to apprehend or arrest one Gerard Edwards?
A Not for the murder."
Out of the presence of the jury, the defendant moved for a mistrial. The defendant's motion was denied as well as defendant's subsequent motion for an admonition to the jury. Detective Venezia then further testified:
"Q And when you were out there [California], did you return with Mr. Edwards?
A Yes, sir, I did.

*894 Q Now, when you returned with him, he was not involved at that time with a criminal prosecution against him?
A That's correct, sir.
Q In fact, he was assisting you in another unrelated matter?
A Yes, sir."
The defendant's motion for a mistrial was based on C.Cr.P. 770, which states in pertinent part:
"Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
. . . . .
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
. . . . .
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial."
C.Cr.P. 771 provides for admonitions to the jury "when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury."
The defendant argues that the response "not for the murder" leaves the obvious inference that the defendant was arrested for another crime. However, the testimony following the remark made it clear to the jury that the defendant was not arrested for any crime that he may have committed, and, in fact, left the positive implication that the defendant was cooperative with the police on another matter. The remark by Detective Venezia was referring to an instance where the defendant was to be a witness, and not to any other crime. The remark is therefore outside the scope of C.Cr.P. 770, and the trial judge was correct in not granting the motion for a mistrial.
While it would have been preferable for an admonition to be given the jury by the trial judge, his failure to do so is not reversible error. The subsequent testimony of Detective Venezia removed any prejudice that may have arisen in the mind of the jury because of the earlier response.
This assignment is without merit.
Assignment of Error No. 11
By this assignment of error the defendant argues that it was error for the trial court to allow the state to impeach the testimony of its own witness, Norma Jean Berry, when her testimony was inconsistent with a prior statement made by her to Detective Pierce. The defense contends that the state should not have been able to claim that it was surprised by her recanting of the original statement since the statement was made under "questionable circumstances," specifically, in exchange for lenient treatment for her common-law husband who had been arrested on a charge unrelated to the Georges' murder. As her husband had since been sentenced to serve fifteen years (that is, the "deal" had fallen through), the defendant contends that Norma Jean Berry no longer had any reason to lie, and therefore the requirement of surprise that would have allowed the state to impeach her testimony was missing.
The statement that Norma Jean Berry had given to Detective Pierce concerned the activities of the defendant the morning following the murders, particularly a conversation that the defendant and the others charged with the murder of the Georges had with her and Wendell Martin, her common-law husband. However, when she was called to the stand, she denied any knowledge of the content of the conversation:
"Q Did Gerard Edwards, Sylvia Fleming and Jake Johnson discuss anything with you that morning?
A They didn't discuss nothing with me.
Q Well, did they discuss anything with anyone in your presence that morning?
A They discussed something with Wendell. I don't know what it was.

*895 Q Ms. Berry, were you able to hear what was said?
A No, I did not.
Q Are you telling me at this time that on that particular morning, on February 28, 1978, when Sylvia Fleming, Gerard Edwards, and Jake Johnson were at your house, you heard them discuss nothing?
A I did not.
By Mr. Meyer [for the state]:
Your Honor, I declare this witness a hostile witness under [487], and I would like the opportunity to prove it up. This comes as a surprise."
The witness was then questioned about whether she had made the statement to the police in which she relayed the content of the conversation. She admitted making and signing the statement, but contended that not all of the statement was true; that it was partly what the police or her husband had told her to say. Her answers to questions concerning the morning after the murder were short and evasive, often denying that she made the answers attributed to her in the written statement. Her hostility to the state is evidenced by statements such as "I don't know why I'm here. I don't know nothing about this" and "What I was going to do, I was going to do for my husband if I take the stand; I feel like I'm the one swindled."
The defendant is incorrect in his assertion that surprise is necessary before the state may impeach a hostile witness. R.S. 15:487 provides that one may impeach his own witness with prior inconsistent statements if "... taken by surprise by the testimony of such witness, or ... the witness show hostility toward him ..." (emphasis added). Therefore, either surprise or hostility will permit impeachment by prior inconsistent statements, and both need not be present. State v. Willis, 241 La. 796, 131 So.2d 792 (1961); State v. Bradford, 367 So.2d 745 (La.1979).
As this witness was clearly hostile, it was not improper to allow her to be impeached.
This assignment of error is without merit.
Assignment of Error No. 13
In this assignment of error the defendant contends that the trial judge erred in allowing into evidence the defendant's written statement and the photograph of the physical lineup.
With regard to the photograph, the defendant argues that there was conflicting evidence as to the exact origin of the photograph, and that showing the defendant in a photograph of a physical lineup is prejudicial. Defendant cites the testimony concerning when the photograph was shown to Willie (whether it was the same day, as Willie testified, or whether it was several days after the lineup, as the police testified) to call in to question its exact origin.
This court has held that a photograph need not be identified by the person who took it to be admissible, State v. Lindsey, 404 So.2d 466 (La.1981), and that a photograph of a physical lineup can be admissible even where the photograph was taken in a different room than the room in which the witness actually viewed the lineup. State v. King, 385 So.2d 223 (La.1980). The discrepancy with regard to the time when the photograph was shown to Willie George does not render it inadmissible. Contrary to defense counsel's assertion, the discrepancy does not call into question the exact origin of the photograph.
The defendant cites State v. Berain, 360 So.2d 822, 827 (La.1978) for the proposition that "... for admission into evidence, a photograph's probative value must outweigh any prejudicial effect upon the jury, and it must be relevant to a material issue at trial...." Under this test, the photograph is admissible. A material issue at trial was the identification made by Willie George of the defendant. The probative value was to show the jury that the lineup was not suggestive or in any manner improperly conducted. This outweighs any prejudicial effect that might have been created by having the defendant present in the lineup photograph shown to the jury.
*896 Defendant's arguments challenging the admissibility of the written statement are the same as those offered in support of his Assignment No. 1 concerning the trial judge's denial of his motion to suppress the statements. For the same reasons applicable to that assignment of error, namely, that the defendant's statement was voluntarily made and not the fruit of an illegal arrest, the trial judge did not err in admitting the defendant's written statement into evidence.
This assignment of error lacks merit.
Assignment of Error No. 14
In this assignment of error the defendant argues that it was error for the trial court to refuse to instruct the jury with defendant's special requested charges numbered 2, 4, 6 and 7.
The right of the defendant to submit special requested charges and the conditions under which they will be given to the jury are set forth in C.Cr.P. 807:
"The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given."
The charges in question read as follows:
"Special Requested Charge No. 2
"Specific intent, which is an essential ingredient or element of the offense with which the defendant at the bar is charged, is a particular state of mind, a determination, not merely to perform some criminal act, but to attain some fixed end which end would constitute the corpus delicti of the very offense charged; and specific intent is of larger and more comprehensive scope than general intent.
`Specific intent' comprehends more than a mere decision to do some unlawful act or acts, it is a thought out design to effect a definite result, a fixed direction of the mind to a particular goal; a contemplation of the particular consequence which would constitute the identical crime charged, combined with an expectation and intention to accomplish that precise effect.
. . . . .
Special Requested Charge No. 4
The jury is not limited to evidence before it to support a reasonable doubt. Reasonable doubt may be based on the lack of evidence in the case. The jury is entitled to acquit because it disbelieves witnesses, because it is not convinced beyond a reasonable doubt, because of a lack of evidence as to an essential element of the offense. The jury is not restricted to the evidence adduced from the witness stand for the creation of a reasonable doubt.
. . . . .
Special Requested Charge No. 6
Just as you must evaluate the evidence in light of your own common experience you must understand that human beings share on (sic) universal characteristic that of fallibility; there are no absolutes.
One of the foremost hinderances to perfection of your judicial system is that of unintentional mistaken identity of the accused by an eyewitness to the crime. This is not to say that the identification is not felt to be an honest one, or one founded on the vindicativeness of the witness to the crime. We as sensitive human beings are above that. It is simply an honestly made mistake of dire consequences.
Special Requested Charge No. 7
You are instructed to consider with respect to eyewitness identification, not only the identification of the person at the scene of the offense, but also the opportunity to observe by the eyewitness, what was alleged to have been done by the person so identified."
*897 The charge given concerning specific criminal intent was "specific criminal intent is a state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."
The defendant asserts that the charge to the jury was incomplete in that it covered a situation in which no desire to commit murder was premeditated, as where the killing resulted from an argument over a drug sale.
The trial judge adequately covered the timing of the formation of specific intent within his charge concerning murder: "The law knows no specific time within which an intent to kill ... must be formed so as to make a homicide murder. If the will of the person accompanies the act a moment antecedent to the act which causes death, it will be as completely sufficient to make the offense murder as if it were a day or any other time."
The defendant's Special Requested Charge No. 2 concerning specific intent was essentially included in the charges given by the judge, such that his refusal to include the special charge was not error.
The source of defendant's Special Requested Charge No. 4 is this court's decision in State v. Gibbs, 355 So.2d 1299 (La. 1978), where we noted that it is improper for the judge to charge the jury that it is limited to evidence produced in court for the formation of a reasonable doubt. The essence of the charge given in the present case was that the jury was not to go beyond the evidence to find facts upon which to base a reasonable doubt, but was permitted to consider the lack of evidence. The jury was also instructed that it was permitted to disbelieve any witness whose veracity was doubtful and to place whatever weight it felt appropriate to the evidence produced. As the defendant's charge was included in the general charges to the jury, the trial judge did not err in refusing to give requested charge No. 4.
Special Requested Charge No. 6 concerning fallibility of human beings and mistaken identifications being a hinderance to the legal system is opinion of the defense counsel and not a wholly correct statement of the law. This charge was properly refused by the trial judge.
The essence of Requested Charge No. 7 was that the jury ought to consider the circumstances surrounding the identification of the accused by the witness at the scene. The charge given to the jury included this: "... you must consider all of the evidence in the case ... considering the means of identification; the circumstances under which he was identified, the opportunity for identifying said defendant; ..." The trial judge properly refused this special requested charge as repetitive.
As all of the defendant's special requested charges were either included in the charges given to the jury or were not wholly correct statements of the law, the trial judge did not commit error in refusing Requested Charges Nos. 2, 4, 6 and 7.
This assignment of error lacks merit.
Assignment of Error No. 17
Defense counsel argues that the trial court erred in denying his motion for a new trial and in denying the defendant's pro se application for a new trial.
The motion for a new trial was based on two grounds: (1) that the verdict was contrary to the law and evidence in that the state failed to prove specific intent to kill, and (2) that the trial court erred in not awarding a mistrial based on Detective Venezia's comment referring to another crime of the defendant.
The defendant's application for a new trial was based on the state's failure to inform the defense of a "deal" arranged for the testimony of Norma Jean Berry in exchange for leniency for her husband who was charged with simple burglary.
There is ample evidence in the record to support a verdict of first degree murder. The defendant's own statement places him at the scene of the crime and he admitted receiving part of the spoils of the armed robbery. The testimony of Willie *898 George, in describing the actions of the two men at the scene, one of which was identified as the defendant, was that "they started shooting at him." It is not necessary for specific intent that the defendant went to the apartment with the preconceived intention of committing murder; it is only necessary that at the time of the shooting that the intention was to kill or inflict great bodily injury. It is clear from the execution style murders (both shot several times in the head), especially with regard to Joy George, who offered no resistance to the robbery, that the specific intent to kill was present.
The remark of Detective Venezia that the defense claims prejudiced the jury by referring to other crimes of the defendant was fully discussed with regard to Assignment of Error No. 9. It was clear from Detective Venezia's testimony, taken as a whole, that the reference was not to another crime of the defendant, but rather to an instance when the defendant was cooperating with the police on another matter. There was no prejudice requiring a new trial.
The defendant's pro se application for a new trial argues that the defendant was denied a fair trial because the state failed to inform him before trial that a deal had been arranged for the statement and testimony of Ms. Norma Jean Berry.
Information concerning the deal was presented to the jury during the testimony given by Ms. Berry. See Assignment of Error No. 11. The defendant contends, however, that he was still prejudiced by the state's not giving him information about the deal prior to trial because he would then have had the opportunity to suppress the statement she had made because of its bias and would have had the opportunity to call additional witnesses to support her contention that a deal had in fact been made. At trial, the state did not offer any evidence to refute Ms. Berry's contention that a deal had been arranged.
From the evidence offered by Ms. Berry at trial and the testimony at the motion for a new trial, it seems reasonable that some form of deal had been arranged. The district attorney testified that he had spoken to Ms. Berry prior to her statement, but denied that any specific deal had been worked out since Ms. Berry did not have firsthand knowledge of the murders. Ms. Berry's attorney testified that he had counseled her to assemble her facts and had accompanied her to a meeting with the district attorney, at which she was promised that, in exchange for her coming forward with the information, her common-law husband would be charged one step lower on the multiple bill (that is, a "quad" would be reduced to a "triple" for example). Wendell Martin, her husband, received fifteen years when he was expecting a life sentence, though he personally refused to make any statement to the police concerning the Georges' murders. It is likely that Ms. Berry misunderstood the deal, since at trial she testified that her impression was that her husband was to be freed in exchange for her statement, and that she had given the statement rather than her husband because of the danger he might face in prison if he were to make the statement himself.
The defendant also contends that the state knew that the statement of Ms. Berry was perjured, since it was made by her under "questionable circumstances." Ms. Berry's attorney testified at the hearing on the motion for a new trial that at the time she made the statement she was pregnant and trying to get her husband out of jail. However, there is nothing in the record to indicate that the state knew that the statement was false.
Under the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the state may not withhold material evidence that is exculpatory to the defendant. This rule also applies to evidence relating to the reliability of key state witnesses. State v. Curtis, 384 So.2d 396 (La.1980); State v. Roussel, 381 So.2d 796 (La.1980). The purpose of the rule is to protect a defendant's constitutional right to a fair trial. Therefore, a reversal of a conviction is only mandated where the defendant has been deprived of his right and, in the case where *899 only a general request for Brady materials is made, "... the omitted evidence creates a reasonable doubt that did not otherwise exist." State v. Willie, 410 So.2d 1019, 1031 (La.1982).
In the present case, the defendant made a general request for Brady materials. The fact of the existence of the deal was presented to the jury by Ms. Berry as she was being impeached by the state as a hostile witness. The state was not permitted to introduce the statement for the proof of its contents, but only for the purpose of attacking her trial testimony, State v. Allien, 366 So.2d 1308 (La.1978), which was not damaging to the defendant as she only denied any firsthand knowledge of facts that could incriminate him. As the jury heard her reasons from the stand as to why she had originally made the statement and would no longer support its contents, the basis upon which the jury could find reasonable doubt was adequately disclosed at trial. It is unlikely that the jury would have reached a different verdict if more details of the deal were made known to it, or other evidence of the circumstances of her making the statement were introduced.
This assignment of error lacks merit.
For these reasons, defendant's conviction and sentence are affirmed.
NOTES
[*] Judges William H. Byrnes, III and David R. M. Williams of the Court of Appeal, Fourth Circuit, and Judge Thomas C. Wicker, Jr. of the Twenty-Fourth Judicial District Court, participated in this decision as Associate Justices pro tempore, joined by Chief Justice Dixon and Associate Justices Calogero, Dennis and Watson.
[1] In defendant's statement the reason given for his going to California was that the others present when the Georges were murdered were going and he felt it best to stay with the group so they wouldn't "try to put their heads together on me." In his testimony at the hearing on the motion to suppress, the defendant stated that he had gone to California "because I didn't want to testify at Wendell McDonald's trial."