685 So.2d 253 (1996)
STATE of Louisiana
v.
Nathaniel GERARD.
No. 96-KA-366.
Court of Appeal of Louisiana, Fifth Circuit.
November 14, 1996.
*254 John M. Crum, Jr. District Attorney, Rodney A. Brignac, Assistant District Attorney, Laplace, for Plaintiff/Appellee.
Margaret Hammond, New Orleans, for Defendant/Appellant.
Before GRISBAUM, DUFRESNE and GOTHARD, JJ.
GOTHARD, Judge.
Defendant Nathaniel Gerard appeals his conviction and sentence for second degree murder. For the following reasons, we affirm.

STATEMENT OF THE CASE
On March 21, 1994, the Grand Jury of St. John the Baptist Parish filed an indictment charging defendant, Nathaniel M. Gerard, with first degree murder of Leo Wells, in violation of LSA-R.S. 14:30.[1] The state amended the bill of information to charge defendant with second degree murder, LSA-R.S. 14:30.1 and the defendant appeared for arraignment and pled not guilty.
The matter proceeded to trial before a twelve person jury on September 5, 6, and 7, 1995. After considering the evidence presented, the jury found Nathaniel Gerard guilty of the second degree murder of Leo Wells.
On December 13, 1995, the court conducted a hearing on defendant's motion for new trial which was filed by newly retained counsel,[2] and after considering the evidence presented, the court took the matter under advisement. On January 10, 1996, the trial judge issued a written judgment, with reasons, denying defendant's motion for new trial. The trial judge then sentenced defendant to the mandatory term of life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant thereafter filed a motion for appeal.

FACTS
On February 10, 1994, at approximately 4:01 a.m., the St. John Sheriff's Office received a 911 call from 221 East 27th Street in Reserve, the residence of Leo Wells. The caller said nothing and hung up. Immediately thereafter, Deputy Gary Gray, the 911 operator, received another call from that residence and again the caller said nothing. In response to these calls, a police unit was promptly dispatched.[3]
Damien Schexnayder, employed by the St. John Sheriff's Office at the time of the incident, responded to the dispatch and upon arrival at the scene, discovered that the front door and the door to the front porch were open. When back-up assistance arrived, Schexnayder entered the residence and discovered blood splattered in the porch and living room areas. He then entered a bedroom and discovered the victim, Leo Wells, lying on the floor, in a pool of blood. The officer also observed several telephones around the victim, one of which was off the receiver. When the officer arrived, the victim was conscious, but weak. He told the *255 officer, "two dudes jumped me." The victim drifted into unconsciousness and was thereafter transported to the hospital, where he died.
At trial, Detective Harry Troxler of the St. John Sheriff's Office, testified about their investigation at the scene. In his capacity of crime scene investigator, Detective Troxler took photographs, dusted for fingerprints and took numerous blood samples. Regarding the fingerprints, the only print which could actually be identified was a palm print belonging to the victim. Troxler also found a partial knife blade on the living room floor which was sent to the crime lab for analysis; however, they were not able to find any fingerprints on the blade itself. In addition, Troxler found a knife handle beneath the bed in the bedroom. He testified that he did not think that the crime lab was able to make a determination as to whether the blade and handle were pieces of the same knife. Regarding serology testing, Detective Troxler testified that to his knowledge, none of the testing matched the blood samples to defendant or to any other individual, nor were any of the hair samples matched to defendant.
After being accepted as an expert in the field of forensic pathology, Dr. Susan Garcia of the Jefferson Parish Coroner's Office, testified that she performed an autopsy on the victim on February 10, 1994, at 9:30 a.m. During the autopsy, Dr. Garcia observed that the victim had numerous lacerations and cuts to his scalp and three stab wounds to the body located in the left chest area, the left back, and the back of the left thigh. In her expert opinion, the cause of death was a combination of two stab wounds, the one to the victim's left chest which perforated the left upper lobe of the lung and penetrated the left atrium of the heart, and the stab wound to the left back which entered the left lower lobe of the lung.
At trial, Gregory Hurst, a friend of defendant's, testified that Nathaniel Gerard called him on February 10, 1994 and asked him to take him shopping for some clothes. Hurst picked up the defendant at the Wendy's in Laplace at about 10:00 or 11:00 that morning. While they were riding around, Gerard told Hurst he had gotten into an altercation the night before and he thought he had killed somebody by stabbing him. Hurst further testified Nathaniel Gerard was wearing his slippers. He asked Gerard what had happened to his shoes and Gerard responded that he had to get rid of his shoes because they had blood on them.
The state also called Wilfred Bourgeois, Jr., an original co-defendant, as a witness. Bourgeois pled guilty as accessory after the fact to the first degree murder of Leo Wells. He received a suspended sentence as part of his plea bargain in return for his testimony at trial. Bourgeois testified that on February 9 and 10, he was out with his friends drinking beer and riding around, and at some point met Nathaniel Gerard and Darryl Martin. As Bourgeois was bringing Gerard home, Darryl Martin said he wanted to get a bag of weed. They went to Leo Wells' house. In the car, defendant said that he was going to "jack" Leo Wells out of some weed.[4] Thinking that defendant was joking, Bourgeois proceeded to 27th Street and stopped his car about one house down from Wells'. At that time, Gerard, who lived nearby, went home, while Darryl Martin knocked on Wells' door to get some weed. About ten minutes later, Gerard returned to Wells' house, wearing a jacket over his blue pants and white t-shirt, and looking as if he was holding something in his hand. Nathaniel Gerard joined Darryl Martin in the house while Bourgeois waited in the car. After ten or fifteen minutes, Gerard and Martin exited the house, and Darryl Martin, acting nervously, jumped into Bourgeois' car and told him to bring him home. Gerard did not get into Bourgeois' car, but walked towards his own house. Bourgeois testified that he did not see anyone enter Wells' house other than Nathaniel Gerard and Darryl Martin.
After the testimony of Wilfred Bourgeois, the state rested its case, and defense counsel then called several witnesses in an attempt to show poor police investigation of the case and the lack of physical evidence against defendant.
*256 Detective Todd Hymel of the St. John Sheriff's Office, testified that he participated in the search of the home of Darryl Martin's mother. During the search, he recovered a die[5] and some rolling papers. He was also looking for blood stained clothing, but found none. Officer Hymel also testified that although he had knowledge that defendant was wearing black slippers sometime on the morning of the murder, he did not submit the slippers to the crime lab for analysis.
Called by the defense, Detective Troxler testified that the scientific analysis report failed to reveal the presence of blood on certain clothing taken from defendant, including a pair of blue "Dickies" pants, blue jogging pants, and a blue and red jacket. He also testified that he did not take fingernail scrapings from the victim or defendant and to his knowledge, no hair samples were matched to defendant or to anyone else.
Detective Destor testified that he participated in the search of the residence of defendant's mother. As a result of his search, he retrieved a pair of blue "Dickies", blue jogging pants, and a white t-shirt. To his knowledge, none of the articles retrieved had blood on them.
Nathaniel Gerard also testified in his own behalf. According to defendant, on February 10, he was standing on the corner with Wilfred Bourgeois and Darryl Martin, drinking beer, when Martin said that he wanted to buy some weed. Since it was late at night and getting chilly, defendant walked home to get a jacket. He and Martin then walked over to Wells' house and Martin knocked on the door. When Wells answered the door, Martin went inside while defendant stayed on the porch. Through the door, defendant saw Martin hand Wells $20.00 and then saw Martin grab Wells, wrestle with him and hit him. When Wells fell on the ground, Martin got on top of him and started stabbing him. Defendant claimed that he tried to stop Martin by asking him what he was doing. Martin replied that he had to kill him because he had seen his face. Having seen Martin stab Wells three times, defendant ran out of the house. Defendant admitted that later that morning Hurst picked him up and while they were together, he told Hurst that he just seen Martin stab this old man. Defendant denied telling Hurst that he had stabbed anybody. During his testimony, defendant denied killing Wells and claimed that Martin did the killing.
After considering the evidence presented, the jury returned with a verdict of guilty as charged to second degree murder.
ASSIGNMENT OF ERROR NUMBER ONE
Defendant's first assignment of error is that the court erred in allowing co-defendant Darryl Martin to invoke his Fifth Amendment privilege against self-incrimination out of the presence of the jury, without allowing defendant Nathaniel Gerard to discuss the ramifications of this to the jury. Combined with this assignment of error the defendant assigns as error, the failure of the court to instruct the jury as the relevance of a codefendant's invocation of his Fifth Amendment privilege against self-incrimination in this case.

DISCUSSION
In the present case, outside the presence of the jury, defense counsel called Darryl Martin, an original co-defendant, to the witness stand. The following discussion transpired:
BY MR. BECNEL:
I call Darryl Martin.
BY THE COURT:
Bring up the witness, Mr. Martin. Darryl Martin has been called as a witness.
BY THE COURT:
Would you make your statement?
BY THE WITNESS:
I would like to take the 5th amendment and have the right not to testify.
BY THE COURT:
Let the record reflect that the witness, Darryl Martin called by the defense in this matter, has invoked the constitutional rights guaranteed by the 5th amendment. The witness is excused.

*257 BY MR. BECNEL:
Your Honor, I would like to have that statement made before the jury.
BY THE COURT:
Denied.
BY MR. BECNEL:
Note my objection to the court's ruling.
After a short bench conference, Darryl Martin was again called to the witness stand at which time the following discussion occurred:
EXAMINATION BY MR. BECNEL:
Q. Please state your name for the record.
A. I would like to plead to the 5th amendment.
Q. You won't tell this court your name?
A. My name is Darryl Martin.
Q. Mr. Martin if I would ask you any questions concerning the nature of your involvement in the murder of Leo Wells are you going to testify to any questions?
A. I would like to take the 5th amendment.
BY MR. BECNEL:
Thank you. I would like to continue the questioning in front of the jury.
BY THE COURT:
State.
BY MS. GRAUGNARD:
Your Honor, the state takes no position. The state does not object. The state takes no position in view of the fact that it would be reversible error for the state to call this witness. The state is not calling this witness and does not intend to attempt to cross exam this witness.
The court then dismissed this witness and did not allow him to invoke his privilege against self-incrimination in front of the jury. The trial judge gave the following reasons for her judgment:
BY THE COURT:
The court in State v. Edwards, 419 So.2d 881, held the trial court did not err in not allowing the defendant to call as a witness before a jury in a murder prosecution, two co-defendants being separately tried who refused to answer questions out of the presence of the jury concerning the night of the murders by invoking their rights under the fifth amendment despite the contention that the defendant has the right to force witnesses to invoke that right before the jury and have the trier of fact draw an inference in that the answers to questions concerning the night of the murders could be raised then and the defendant who was aware that the witness would not offer any testimony favorable to him, wish to call these witnesses solely for the purposes of having them invoke their privilege in front of the jury. This court was informed, as was the state and the defense by counsel for Mr. Martin that he intended to invoke his right against self incrimination and, therefore, on the basis and also realizing the defense already in the presence of the jury announced their next witness would be Mr. Darryl Martin, this court will not allow this to be done in the presence of the jury. This court will explain to the jury at the proper time in their instruction that he was not called as a witness. He would not testify before them. The fact of the matter is the opening arguments are not evidence. And, the court is bound by the law. Based on the holdings in this case, which is a Supreme Court case, which is still good law, this court will not allow his invoking of the privilege to be in the presence of the jury.
The witness is dismissed.
The Fifth Amendment to the United States Constitution, made applicable to the states in Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) provides, in pertinent part, that "No person ... shall be compelled in any criminal case to be a witness against himself." In addition, the La. Const. of 1974, Article I, Section 16, states that "No person shall be compelled to give evidence against himself." The privilege against self-incrimination must be liberally *258 construed in favor of the accused or witness. State v. Wilson, 394 So.2d 254 (La.1981).
Where the privilege against self-incrimination is invoked by a witness, there must be reasonable cause to apprehend danger from a direct answer, Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951), and the privilege may be asserted only with respect to particular questions. State v. Edwards, 419 So.2d 881 (La. 1982).
However, the Louisiana Supreme Court has recognized certain limited exceptions to the requirement that the witness be presented to the jury to invoke the privilege against self-incrimination in response to each question. These instances are characterized by the position of the witness and the nature of the question such that "... an answer or explanation of a refusal to answer any question posed could result in injurious disclosure...." State v. Coleman, 406 So.2d 563, 566-67 (La.1981); State v. Edwards, supra. The Louisiana Supreme Court has held that it is not necessary for a witness charged with participating in the same crime for which the defendant is being tried, to assert the privilege on a question by question basis, when it is apparent that the witness will be asked to testify only regarding matters which could be expected to require the invocation of the privilege. State v. Brown, 514 So.2d 99 (La. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988), rehearing denied, 487 U.S. 1228, 108 S.Ct. 2888, 101 L.Ed.2d 923 (1988); State v. Jones, 559 So.2d 492 (La.App. 5 Cir.1990), writ denied, 566 So.2d 981 (La.1990).
In addressing the issue of whether it is permissible to allow a witness to assert his Fifth Amendment privilege in the presence of the jury, the Louisiana Supreme Court, in State v. Berry, 324 So.2d 822, 830 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976), stated:
It is improper conduct for either the prosecution or the defense knowingly to call a witness who will claim a privilege, for the purpose of impressing upon the jury the fact of the claim of privilege. American Bar Association Standards of Criminal Justice, Relating to the Prosecution Function, Standard 5.7(c), and Relating to the Defense Function, Standard 7.-6(c) (1971).
As the commentaries to these standards indicate, claims of privilege are preferably determined outside the presence of the jury, since undue weight may be given by a jury to the claim of privilege and due to the impossibility of cross-examination as to its assertion. (The commentaries also note the impropriety of either counsel arguing any inference from the failure of another to call a witness, if the failure to do so is known to be based on the witness's claim of privilege.) For similar reasons, the courts have uniformly rejected a defendant's claim of error based upon the denial of his request that a witness assert his claim of privilege before the jury. See United States v. Lacouture, 495 F.2d 1237 (C.A.5, 1974), and decisions therein cited. See also Namet v. United States, 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963).
In State v. Edwards, supra, defendant argued that the trial court erred in not allowing him to call, as witnesses before the jury, two co-defendants being separately tried. Those two defendants, out of the presence of the jury, refused to answer questions concerning the night of the murders by invoking their rights under the Fifth Amendment. In Edwards, defendant argued that he had the right to force the witnesses to invoke that right before the jury and have the trier of fact draw an inference. In support of his argument, the defendant reasoned that the prosecution is able to force the testimony of persons involved in crimes through the granting of immunity or the reduction of charges, and due process requires that the defendant be recognized as having a counterbalancing right, such as requiring witnesses to take the Fifth Amendment before the jury or allowing the possibility of judicial immunity. In rejecting defendant's argument, the Louisiana Supreme Court stated as follows:
In this case both of the witnesses that the defendant sought to call were charged with first degree murder for the same crime as that charged to the defendant. Neither had yet been tried. Clearly there was reasonable danger that direct answers to questions concerning the events of the *259 night of the murders could be injurious to them, entitling them to the Fifth Amendment's protection. Hoffman v. United States, supra.

It is equally clear that questions concerning the night of the murders asked of others charged with the offense along with the defendant would place those witnesses in a position where a refusal to answer or an explanation of that refusal could result in injurious disclosures. State v. Coleman, supra. These witnesses were called to the stand out of the presence of the jury where each claimed Fifth Amendment protection. Once the trial judge determined that they would refuse to answer any question concerning the murders, it was proper for him not to allow the witnesses to be called before the jury. State v. Johnson, 504 [404] So.2d 239(sic) (La.1981); State v. Day, 400 So.2d 622 (La.1981); State v. Berry, 324 So.2d 822 (La.1975), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976).

State v. Edwards, supra at p. 892.
In the present case, Darryl Martin was charged with the crime of first degree murder of Leo Wells and had not yet gone to trial. Clearly, questions posed to this witness concerning the murder would place him in a position where a refusal to answer or an explanation of that refusal could result in injurious disclosures. Based on the previously discussed jurisprudence, it was not error for the trial judge to allow a blanket assertion of Martin's privilege where he was charged with participation in the same crime as defendant and it was apparent that the questioning would be devoted to subject matter which would require Martin to invoke the Fifth Amendment privilege. State v. Jones, supra. Once the trial judge determined that the witness would refuse to answer any questions about the murder of Leo Wells, it was proper for her not to allow the witness to be called before the jury. State v. Edwards, supra.
In the actual assignment of error, defendant also complains that the trial judge erred by failing to instruct the jury on the relevance of a co-defendant's invocation of his Fifth Amendment privilege against self-incrimination. Defense counsel does not address this issue in her actual argument, and accordingly, it is waived. Where a defendant has raised no legal argument in support of his allegation alleged in his assignment of error, that allegation is deemed abandoned on appeal. State v. Bates, 301 So.2d 619 (La. 1974). It is noted however, that the trial judge instructed the jury "to draw no inference for or against either the state or the defendant from the fact that certain persons were mentioned or called as witnesses but did not actually testify."
Based on the foregoing discussion, this assignment of error is without merit.
ASSIGNMENT OF ERROR NUMBER TWO
Defendant's second assignment of error is that the court erred in denying the defendant's motion for new trial once it was learned that juror Milton Smith withheld evidence of his relationship to co-defendant Wilfred Bourgeois, Jr., who turned state's evidence against Nathaniel Gerard.

DISCUSSION
In the present case, defendant moved for a new trial on the basis of information obtained after the verdict that one of the jurors, Mr. Milton Smith, is the godfather of his codefendant, Wilfred Bourgeois. Bourgeois testified against the defendant at trial. The matter came before the court for a hearing on December 13, 1995. After considering the evidence presented, the judge took the matter under advisement, and on January 10, 1996, issued a judgment denying defendant's motion. The trial judge gave the following reasons for her denial:
Defendant's motion for new trial is based on the fact that juror, Milton Smith, failed to disclose on voir dire, that one of the State's witness, Wilfred Bourgeois, was his godson. At the hearing, Mr. Smith testified that he could not recall the last time he had seen Mr. Bourgeois prior to the trial. He stated that he did not recognize the witness' name, as his godson when asked on voir dire. Only when Mr. Bourgeois appeared to testify did he know that it was his godson.

*260 Granting of a new trial in a criminal case is governed by Article 851 of the Code of Criminal Procedure. Based upon the evidence presented, defendant has failed to show that he suffered any prejudicial error or defect as a result of the juror's failure to disclose his relationship to Mr. Bourgeois. Under C.Cr.P. art. 851(4), the error or defect must be prejudicial to the defendant before a new trial can be granted. There has been no such showing. To the contrary, Mr. Smith testified that he voted `Not Guilty'.
For the foregone reasons, defendant's motion for a New Trial was denied.
LSA-C.Cr.P. art. 851 provides the grounds for a new trial as follows:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
(2) The court's ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
The decision on a motion for new trial rests within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a clear showing of abuse. State v. Fuller, 414 So.2d 306 (La.1982); State v. Williams, 25,835 (La.App. 2 Cir. 2/23/94), 632 So.2d 893. The trial court is not required to grant a motion for new trial where no injustice is shown to have been done to defendant. State v. Williams, supra.
In State v. Dockens, 528 So.2d 240 (La. App. 3 Cir. 1988), writ denied, 533 So.2d 15 (La.1988), defendant argued that the trial judge erred in denying his motion for new trial which was based, in part, on irregularities in the selection of the jury. During the voir dire examination in Dockens, juror Grace Sepulvado was asked if she was related to anyone in the case. After indicating that she was not, she was accepted on the jury. Thereafter, in defendant's motion for new trial, he asserted that she was, in fact, related to the victim. At the subsequent hearing on the motion for new trial, the victim's wife testified that her husband often referred to Ms. Sepulvado as "Aunt Gracie." Ms. Sepulvado also testified at this hearing and unequivocally stated that she was not related to the victim. In Dockens, the appellate court found no merit to defendant's argument based on the fact that defendant was not able to establish that Ms. Sepulvado was actually related to the victim or that the defendant was prejudiced in any way.
In State v. Williams, supra, defendant claimed that the trial court erred in denying his motion for new trial which was based on defendant's contention that juror Frederick Blake had failed to inform the court during voir dire that he had attended school with the defendant and his siblings and that their fathers had worked together. The appellate court found that the trial court did not err in denying defendant's motion for new trial, as there was no evidence in the record, beyond the self-serving testimony of the defendant, to indicate that Mr. Blake actually knew the defendant. Furthermore, the record failed to establish that Mr. Blake ever recognized the defendant or made any connection between him and other members of the defendant's family. Furthermore, defendant failed to demonstrate that he was prejudiced in any way.
*261 In the present case, the trial judge did not err in denying defendant's motion for new trial. According to the trial court's reasons for judgment, Mr. Smith testified at the motion hearing that he could not recall the last time he had seen Mr. Bourgeois. Mr. Smith further testified that he did not recognize the witness's name as his godson when asked on voir dire and that only when Bourgeois appeared to testify did he realize that it was his godson. Moreover, it does not appear that defendant demonstrated that he was prejudiced, especially in light of the fact that it appears that this juror voted not guilty. Based on the foregoing discussion, this assignment is without merit.
ASSIGNMENT OF ERROR NUMBER THREE
Defendant assigns also other errors as are patent on the face of the record. We have conducted a complete and independent review of the record before us in accordance with LSA-C.Cr.P.Art. 920 and we find no reversible errors patent.
For the reasons discussed, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The indictment also charged Darryl Martin with first degree murder and Wilfred Bourgeois, Jr., as a principal to first degree murder. It appears from the record that at the time of Nathaniel Gerard's trial, Bourgeois had entered a plea agreement with the state and had already been sentenced whereas the charges against Darryl Martin were still pending and he was awaiting trial.
[2] On October 11, 1995, the date originally set for sentencing, the court allowed current counsel, Margaret Hammond, to enroll as counsel and released defendant's previous attorney from his duties.
[3] After the unit was already dispatched, a third call came in from the residence and once again, the caller said nothing.
[4] Bourgeois testified that "jack" means to "rob him or snatch it."
[5] It is noted that two die were found in Wells' house, a red one and a white one.