# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 14-594

**STATE OF LOUISIANA**

**VERSUS**

**WARREN RAY GAUTREAUX**

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 11-K-5616-A
HONORABLE JAMES PAUL DOHERTY, JR., DISTRICT JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Billy Howard Ezell, Judges.

**AFFIRMED.**

**Edward John Marquet**
**Louisiana Appellant Project**
**Post Office Box 53733**
**Lafayette, LA 70505-3733**
**Telephone:  (337) 237-6841**
**COUNSEL FOR:**
       **Defendant/Appellant - Warren Ray Gautreaux**

**Earl B. Taylor**
**District Attorney – 27th Judicial District**
**Jennifer Ardoin**
**Assistant District Attorney – 27th Judicial District**
**P. O. Drawer 1968**
**Opelousas, LA 70571**
**Telephone:  (337) 948-0551**
**COUNSEL FOR:**
       **Plaintiff/Appellee - State of Louisiana**

**Warren Ray Gautreaux**
**Louisiana State Penitentiary**
**Main Prison C-B-C   U-L-12**
**Angola, LA 70712**

**THIBODEAUX, Chief Judge.**

The defendant, Warren Ray Gautreaux, appeals his convictions of two counts of first degree murder, a violation of La.R.S. 14:30. He was sentenced to life imprisonment on each count without benefit of probation, parole, or suspension of sentence, with sentences running concurrently and credit for time served. Finding no merit to the defendant's assignments of error, we affirm the convictions and sentences for two counts of first degree murder.

## I.

## ISSUES

We must decide:

(1) whether the trial court erred by allowing hearsay testimony not excepted under La.Code Evid. art. 803;

(2) whether the trial court erred in not allowing the defendant's attorney to ask the State's witnesses whether they had pending criminal charges; and

(3) whether the trial court erred in not granting the defendant's motions for a new trial.

## II.

## FACTS AND PROCEDURAL HISTORY

The defendant was convicted of the first degree stabbing murders of Youric and Mary Courville in their home at 231 Boudreaux Street, Eunice, Louisiana, on the evening of January 9, 2006. Mrs. Courville was approximately seventy years old, and Mr. Courville was in his eighties. Their daughter found them the following day. Mr. Courville was lying in front of the refrigerator, and Mrs. Courville was lying in the doorway of her bedroom.

An autopsy by Dr. Collie Trant revealed that Mrs. Courville died as a result of an incised wound to her left wrist that severed the artery and vein. Other cuts to her body occurred postmortem. She had bruises on the left side of her face, under both sides of her jaw, under her chin, on her left upper chest and left lower chest, on the backs of her hands and fingers, and on her left knee; she had abrasions on both knees. Mr. Courville died from a stab wound to the left chest that punctured the lobe of his left lung.

Four or five blocks away, at 210 College Road, a trailer occupied by Kenneth Dupre caught fire on the night of the stabbings. Defendant Gautreaux was living at the Dupre residence at the time. Dupre allegedly called Gautreaux's ex-wife during the fire and told her his house was burning because Gautreaux had put a candle behind the recliner and caught the house on fire to hide evidence. Gautreaux's ex-wife testified that she received two additional calls that night from Gautreaux during which he admitted killing an old couple.

In March 2012, Gautreaux was charged by indictment with two counts of first degree murder. He entered pleas of not guilty. A notice of intent not to seek the death penalty was filed.

At trial in May 2013, the jury heard the testimony of three witnesses to whom Gautreaux confessed the killings, one witness to whom he confessed causing harm with a knife and burning evidence, and three other witnesses with whom he discussed plans beforehand to steal money and drugs from an old couple in the neighborhood. Many of the testifying witnesses had a criminal history.

Following trial, the jury returned verdicts of guilty on each of the two counts of murder. Two motions for new trial were heard and denied.

In March 2014, the defendant was sentenced to serve life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence on each count, to run concurrently. Oral and written motions for reconsideration of sentence were denied.

On appeal, the defendant asserts that the trial court erred in allowing hearsay testimony not within an exception stated in La.Code Evid. art. 803; in not allowing his trial attorney to examine the State's witnesses regarding the existence of pending criminal charges; and in not granting a new trial to explore pending criminal charges of witnesses.

III.

## LAW AND DISCUSSION

### *TRIAL TESTIMONY*

Trial testimony pertinent to the issues on appeal indicates that before dark on the evening of January 9, 2006, Gautreaux went to the residence of Holly Fogleman.[1] Fogleman testified that Gautreaux said he wanted to get drugs and money. When Fogleman left to procure her own drugs, Gautreaux was still there, as was Ashley Taylor, a sixteen-year-old runaway who was staying with Fogleman. Taylor testified that Gautreaux said he knew of a house with an old couple who had money and drugs and that it would be an easy in-and-out job for him and another guy.

Brady Fuselier testified that he lived eight or nine blocks from the Courvilles. He stated that some time after 6:00 p.m., as he was walking to the store, he saw Gautreaux who told him of an old couple they could rob for pain

_____

[1] Charles Fontenot also arrived at Fogleman's apartment at some point.

3

killers and money. Gautreaux gave the location of the house which Fuselier said was about 200 yards away. Gautreaux asked Fuselier to assist him with the robbery. Fuselier said he was going home.

Charles Fontenot testified that he had known Gautreaux most of his life and that Gautreaux lived in Dupre's house at the time of the killings. Fontenot said that Gautreaux was at Dupre's house several days after the incident, and that, during this time, Gautreaux looked different. When Fontenot asked what was wrong, Gautreaux kept saying he could not believe what he had done and that he had hurt someone "real bad." Fontenot further stated that Gautreaux said he and Quincy Ceasar went to the Courvilles' house fiending for drugs and things got out of hand. Gautreaux said that he had hurt Mrs. Courville, that a knife was involved, that he and Ceasar had run back toward Dupre's house, washed off in a coulee, and split up.[2] Once back at Dupre's house, Gautreaux said he changed clothes quickly and deliberately knocked over a candle to get rid of the evidence, specifically his clothes. Fontenot testified that Gautreaux threatened to hurt him if he told anyone.

Robert Kibodeaux testified that after the murders, he was in the Eunice jail with Gautreaux and asked him whether he had killed the Courvilles. Gautreaux initially responded, "don't put me in that bind," but later admitted that he had killed a man and burned the evidence. Kibodeaux testified that Gautreaux said he was paid twenty dollars to help the man hoe; he saw a wad of money and went back that night to ask for more money. Gautreaux was refused, but while there, he went inside to use the bathroom and unlocked a window. Later when both were out of jail, Kibodeaux said Gautreaux showed up at his house, and

---

[2]Testimony indicated that Dupre's trailer had no water and no electricity, and that candles were used for light.

4

Gautreaux admitted going into the Courville house through the window and killing both victims with a knife and burning his bloody clothes in the fire.

Jimmy Lee testified that he had also been in the Eunice jail with Gautreaux. Lee said Gautreaux admitted that he had done things he was not proud of; that he had met up with "Q" and they were looking for drugs and money; that they took care of business; and that Gautreaux ended up with a mouth full of rocks and cash in his pockets. Lee further testified that Gautreaux said he would not be caught because the knife was thrown in a house, and the house burned down.

Rita Labbe testified that she was briefly married to Gautreaux, that they had a daughter together and had ongoing visitation issues. On the night of the murders, Dupre called her, waking her up, and said excitedly, "My house is on fire, my house is burning." Dupre told her that Gautreaux put a candle behind the recliner and caught the house on fire "to hide the evidence." Labbe testified that during this call she heard sirens and people screaming. She testified that she did not get up or look at the clock, but she usually went to bed between 9:30 and 10:00, and she thought the call came after 10:00. Labbe testified that Gautreaux called about a half hour later, telling her repeatedly that he had "messed up bad." She responded that Dupre's house was on fire, and Gautreaux said, "Yeah, his house is on fire. . . . [b]ut something bad happened. . . . I did something bad." When Labbe asked what he had done, Gautreaux told her he had killed two old people.

Labbe testified that she did not go back to sleep after Dupre's phone call. Around 11:30, Charles Fontenot called her and handed his phone to Gautreaux. Labbe was questioned about Warren Ray Gautreaux's call as follows:

Q.    And what did Ray tell you this time?

5

A.     That he was very upset and he just said, "I messed up, I messed up."  And I said, "Well, why would you kill some old people like that?"  He said, "Because I got caught."

Q.     And did he tell you what he got caught doing?

A.     No, he just said, "I got caught."

     . . . .

Q.     Did he tell you how he killed them?

A.     He said he stabbed them.

Q.     Did he tell you why he stabbed them?

A.     He told me because he got caught by them, they caught him in his house -- in their house.  He got caught.

     . . . .

Q.     Did he say -- did he say anything about what the old people might have said to him, or did when they caught him?

A.     He said, "She wouldn't shut up, she wouldn't shut up, the f_ _ _ _ _ _ bitch wouldn't shut up."

Q.     Okay; and so what did he do?

A.     He just kept stabbing her.

Q.     That's what he told you?

A.     He choked her.

Q.     And what did he -- what did he say about the old man?

A.     He walked in on him and he stabbed him, too.  And I said,  "I Don't want to hear anymore [sic] of this" and I hung up.

Labbe testified that Gautreaux later denied the events.  At some point, however, he told her that he would never get caught because there was no murder weapon; that he got rid of his shoes, giving them to an inmate, and that his step-father brought him more shoes to the jail.  Labbe further testified that, as long as

6

she had known Gautreaux, he liked to wear FILA brand shoes, the same logo type found imprinted in the blood inside the Courville home. Labbe further testified that Gautreaux told her "he knew the Courvilles, and they were his friends." Labbe said that she did not call the police after she spoke to Gautreaux as she was afraid that he would kill her, that he had tried to kill her in the past, and that he threatened her fiancé, Luke Gonzales, as well. Gonzales testified that Labbe handed him the phone during one conversation and that he heard Gautreaux threaten to kill Labbe if she talked to the police.

### HEARSAY EXCEPTION

Gautreaux contends that the trial court erred in allowing Rita Labbe to testify about what Dupre told her on the phone the night the Courvilles were killed because Labbe's testimony did not fall under one of the hearsay exceptions of La.Code Evid. art. 803. We disagree. We find, as the trial court did, that Dupre's comments were excited utterances, and therefore admissible under La.Code Evid. art. 803, which provides in pertinent part:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (1) Present sense impression. A statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter.
>
> (2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Kenneth "TT" Dupre was deceased at the time of trial. When the State attempted to question Labbe about what Dupre said to her when he called during the fire, defense counsel objected, stating that such testimony was hearsay.

7

The jury was removed from the courtroom, and the State continued to question Labbe about the phone call. The court heard argument regarding the admissibility of Labbe's testimony and ruled that Dupre's remarks were excited utterances under La.Code Evid. art. 803(2) even though they may have been made some time after the fire started.[3] The trial court found that the conversation occurred while the fire was ongoing and allowed Labbe to testify as to what Dupre told her. The jury returned to the courtroom and heard the following testimony:

> Q. Okay; my question was, what woke you up that night?
>
> A. The phone call.
>
> Q. Okay; who was the phone call from?
>
> A. "TT" [Kenneth Dupre].
>
> Q. Okay; and this is "TT." [Y]ou said you've known for how long?
>
> A. Twelve years.
>
> Q. Okay; are you certain that was "TT's" voice?
>
> A. Yes, ma'am.
>
> Q. Okay; and this phone call woke you up out of bed?
>
> A. Yes, ma'am.
>
> Q. Okay; and when you answer the phone call, can you tell me, what did he say to you?
>
> A. He was just yelling and he was very upset saying, his house was on fire, that it was burning down.
>
> Q. It was burning down, what did you say?
>
> A. I said, "For real?" I said, "Are you sure?"
>
> Q. He said, "Yes, it's burning down." I said, "What happened?" He said, Boo-Boo [Gautreaux] had put a candle behind the recliner and caught it on fire.
>
> Q. Okay.

---

[3]There was evidence that the fire was called in at 9:15 p.m.

8

A. And I asked him, "Why?" And he said, "Because." And T said -- he wouldn't say at first and I thought it was over drugs. He said, "No, it's because he trying to hide evidence."

Q. And that's his words?

A. Yes.

Based upon this testimony, Dupre's remarks about Gautreaux setting his house on fire and trying to hide evidence were excited utterances which are admissible under La.Code Evid. art. 803(2).

Gautreaux asserts that Dupre's statement regarding the destruction of evidence was not contemporaneous with the event, and thus the trial court should have allowed the hearsay testimony regarding there being a fire and nothing more. We disagree. Article 803(1) requires a statement made while the declarant is perceiving the event, or immediately thereafter; but 803(2) requires only an excited utterance about a startling event made while the declarant is still under the stress of excitement caused by the event. Thus, 803(1) calls specifically for immediacy, while the focus in 803(2) is that the statement be close enough in time to be the result of a spontaneous reaction to the event and not the result of reflective thought. *See State v. Griffin*, 45,045 (La.App. 2 Cir. 1/27/10), 30 So.3d 1039, *writ denied*, 10-447 (La. 9/17/10), 45 So.3d 1043. We find no error in the trial court's admission of Labbe's testimony regarding the phone call because Dupre's statements were excited utterances under La.Code Evid. art. 803(2).

Further, the Louisiana Supreme Court has long held that the admission of even hearsay testimony is harmless error where the effect is merely cumulative or corroborative of other testimony adduced at trial. *State v. Johnson*, 389 So.2d 1302 (La.1980). Here, Labbe's testimony about Dupre's phone call was cumulative of and corroborated by other testimony given before Labbe took the

9

stand.  Fontenot had testified that Gautreaux said he had a bag of clothes in Dupre's house, changed quickly, and deliberately knocked a candle down to burn evidence, specifically clothes.  Kibodeaux testified that Gautreaux said he had burned evidence and had thrown his bloody clothes in a fire.  Further, Lee testified that Gautreaux said he threw the knife in a house, and the house burned down.  There was no objection to the testimony of Fontenot, Kibodeaux, or Lee.  Thus, the record as a whole indicates that the introduction of Labbe's testimony, even if considered partially improper, would have constituted harmless error.  Accordingly, this assignment of error is without merit.

### *PENDING CRIMINAL CHARGES*

At trial, when a witness for the prosecution testifies against a criminal defendant, the defendant is allowed an opportunity to impeach the witness for bias by illuminating for the jury any motives that the witness might have for helping the prosecution make its case.  Exposure of a witness's motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.  U.S. Const. amend. VI; *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431 (1986); La.Const. art. 1, § 13; *State v. Brady*, 381 So.2d 819 (La.1980).  However, the confrontation clause does not prevent a trial judge from imposing limits on defense counsel's inquiry into the potential bias of a prosecution witness.  *Van Arsdall*, 475 U.S. 673.  To the contrary, trial judges retain wide latitude to impose reasonable limits on such cross-examination based upon their concerns regarding harassment, prejudice, confusion of the issues, witness safety, and interrogation that is repetitive or only marginally relevant.  *Id.*

A prosecution witness's criminal history is often the subject of impeachment attempts. Here, during the testimony of prosecution witness Charles Fontenot, who was incarcerated at the time of his testimony, defense counsel sought to explore whether the State had offered him leniency on any *pending charges* that he might have had. When the State objected, the trial court cited La.Code Evid. art. 609.1 and ruled that inquiries into promises of help were allowed but not specific inquiries into pending charges. Louisiana Code of Evidence Article 609.1 provides in pertinent part:

> A. General criminal rule. In a criminal case, every witness by testifying subjects himself to examination relative to his criminal convictions, subject to limitations set forth below.

> B. Convictions. Generally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.

> . . . .

In this case, the trial court's ruling based upon La.Code Evid. art. 609.1 occurred in chambers out of the hearing of the jury, where the following exchange occurred between counsel and the court:

> MR. CLAIBORNE [defense counsel]: Your Honor, I feel that if this witness -- you're absolutely correct, prior convictions, you know, we can impeach him with that. But if there's some possible inducement that this witness feels that he would receive with pending charges for his testimony, I think the jury needs to know that. And it's highly relevant in this particular case, even though he has not been convicted at this time.

> MR. RICHARD [prosecutor]: He asked -- he was asked and answered if he received any help and so. . .

> THE COURT: Well, I think there's a way of doing it. The way of doing it is, is not to mention pending charges. The question is, have you been offered any help either now or in the future?

Gautreaux contends that through this ruling the trial court erroneously prevented defense counsel from cross-examining the State's witnesses about pending criminal charges at the time of their testimony. While the general rule is that only convictions can be used to impeach credibility under La.Code Evid. art. 609.1, many cases have held that pending charges that have not resulted in a conviction may be used to show specific bias or interest in the outcome of a case. In *State v. Vale*, 95-1230, p. 4 (La. 1/26/96), 666 So.2d 1070, 1072, the Louisiana Supreme Court stated:

> [T]o the extent exposure of a witness's motivation is a proper and important function of the constitutionally protected right of cross-examination, a witness's "hope or knowledge that he will receive leniency from the state is highly relevant to establish his bias or interest." *State v. Brady*, 381 So.2d 819, 822 (La.1980) (collecting cases); see also *State v. Nash*, 475 So.2d 752, 755-56 (La.1985). A witness's bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct. *Id.*

In reconciling the constitutionally protected right of cross-examination with statutes limiting the scope of the examination, we turn to the Louisiana Supreme Court in *Brady*, 381 So.2d 819, which differentiated between eliciting *general credibility* impeachment testimony and cross-examination to show *a particular bias or interest*. When the impeachment of a witness is sought on grounds relevant to the witness's credibility in general, the fact that the witness has been arrested or indicted is not logically relevant to such purpose, since an arrest or an indictment is only an accusation. *Id.* Hence, cross-examination is

limited to convictions (proven crimes) under La.Code Evid. art. 609.1. However, where the focus of the defense counsel's questioning is to establish that the district attorney's office may have leverage over a witness as a result of a pending charge, or that the witness might have assumed so, such cross-examination into pending charges is proper and is not precluded by statute. *See Brady*, 381 So.2d 819. This is true because the purpose of the cross-examination is to show the witness's particular bias or interest in the outcome of the case, thus providing a reason why the credibility of the witness might be suspect in a particular case. *Id.*

Accordingly, here, where defense counsel explained to the trial judge in chambers that he wanted to pursue the line of questioning into pending criminal charges to discover a possible inducement that Mr. Fontenot might have for his testimony, under the line drawn by *Brady*, the mention of pending charges was not a forbidden area of inquiry.

However, the analysis does not end here. As the United States Supreme Court stated in *Van Arsdall*, 475 U.S. 673:

> [T]he constitutionally improper denial of a defendant's opportunity to impeach a witness for bias, like other Confrontation Clause errors, is subject to *Chapman* [ *v. California,* 386 U.S. 18, 87 S.Ct. 824 (1967)] harmless-error analysis. The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. Cf. *Harrington* [v. California], 395 U.S. [250], 254, 89 S.Ct.

[1726], 1728 [(1969)]; *Schneble v. Florida,* 405 U.S.
[427], 432, 92 S.Ct. [1056], 1059 [(1972)].

*Van Arsdall*, 475 U.S. at 687; *See also State v. Vale*, 666 So.2d 1070; *State v. Williams*, 03-1773 (La.App. 3 Cir. 6/2/04), 878 So.2d 765; *State v. Boswell*, 96-801 (La.App. 3 Cir. 2/12/97), 689 So.2d 627; *State v. Quinn*, 12-689 (La.App. 4 Cir. 8/21/13), 123 So.3d 320, *writ denied*, 13-2193 (La. 3/14/14), 134 So.3d 1195.

Here, as indicated, Charles Fontenot was incarcerated at the time of trial. He was questioned extensively by the State's counsel and by the defense counsel regarding his criminal record and any inducement he may have had for giving his testimony. On direct examination by the State, Mr. Fontenot testified that he was imprisoned for several felonies, that his request for assistance was rejected by the State, and that he was never promised anything of value.

On cross-examination, Fontenot confirmed his felony convictions and the denial of his request for assistance. When asked about pending charges, the State objected, and the court instructed defense counsel in chambers: "The way of doing it is, is not to mention pending charges. The question is, have you been offered any help either now or in the future?" The parties returned to the courtroom and the jury, and the defendant's counsel, Mr. Claiborne, continued the cross-examination as follows:

> Q. So sir, at the time you gave your second statement on November 17, 2011, you did inquire about some possible help--
>
> A. Yes, I did.
>
> Q. -- from the officers right, at that time?
>
> A. Yes, I did.
>
> Q. All right; are you aware that there is a reward in this case?

14

A.     No, I don't.

Q.     You were never told that?

THE COURT: Speak up.

A.     No, sir, I don't.

Q.     Okay; you never heard that from anybody?

A.     No, sir.

Mr. Fontenot was questioned in depth about his criminal record and the time he was still serving. During the course of his testimony, he was specifically asked repeatedly whether he had ever been promised leniency or a reward of any kind in exchange for his testimony. He answered in the negative eleven times.

When we apply these facts to the *Van Arsdall* factors—the importance of the witness's testimony, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case—we find only harmless error.

Clearly, the extent of the cross-examination permitted was extensive in this case. In fact, defense counsel could have asked Fontenot numerous other questions about inducements as the trial court allowed questions about any help offered "either now or in the future." Further, defense counsel did not ask Fontenot about any *hope* that he would receive leniency in exchange for his testimony, which was not covered by the State's objection. Between the State's questions and the defense's questions, Fontenot's criminal record was repeatedly revealed and he answered in the negative about deals and inducements eleven times, in addition to repeatedly confirming prior responses.

15

With regard to defense counsel's assertion that he was prohibited from asking all of the State's witnesses about inducements related to pending charges, we note that Fogleman, Taylor, and Fuselier testified before Fontenot, and defense counsel did not attempt to ask those three witnesses about pending charges. Thus, any argument that the trial court prohibited the questioning of those witnesses about pending charges is unsupported. Likewise, there was not even an attempt to question witnesses testifying after Fontenot about pending charges. Additionally, there was no proffer during the trial regarding charges pending against any witness.

Fontenot's testimony was important to the State's case because he testified that the Defendant told him that he killed the Courvilles. However, other testimony corroborates Fontenot's testimony. Kibodeaux testified that Gautreaux stated he went through a window of the Courville house looking for money and killed them both. Douglas Lancon, the forensic expert, opined that the perpetrator had gone through a window of the Courvilles' home. Labbe testified that Gautreaux told her he killed two old people by stabbing them, and Dr. Collie Trant testified that the Courvilles died as the result of being stabbed.

Sheryl Comeaux, the Courvilles' next-door neighbor with whom Gautreaux had lived for two weeks, testified that Gautreaux knew the Courvilles. Labbe also testified that Gautreaux knew the Courvilles. Fogleman testified that Gautreaux was looking for money and drugs the day before she found out the Courvilles were dead. Taylor testified that Gautreaux said he knew of a house where an old couple lived, and they had money and drugs. Fuselier testified that the night before he discovered the Courvilles had been killed, he encountered Gautreaux, who suggested they rob the two old people who lived behind the store because they had pain killers and money. Fuselier testified that the Courvilles'

16

home was approximately two hundred yards away. There was testimony from Kibodeaux and Lee that Gautreaux destroyed evidence, including his clothing and a knife, in the fire at Dupre's home. Thus, contrary to the defendant's assertion, there was corroborating testimony from all of the witnesses regarding the material points.

The only contradiction that Gautreaux points to in Fontenot's testimony is Fontenot's statement that he had the conversation, wherein Gautreaux implicated himself, on January 13 or 14, 2006, and Gautreaux was incarcerated in the city jail on those dates. However, Fontenot testified that he was not sure of the actual date on which this conversation occurred. Based on the evidence presented, the trial court's failure to allow defense counsel to specifically discuss *pending charges* in questioning Fontenot about deals and inducements related to his deeply discussed criminal record was harmless error. Accordingly, this assignment of error lacks merit.

## *MOTIONS FOR NEW TRIAL*

Gautreaux contends that the trial court erred in not granting his motions for new trial where he was prejudiced because he was not allowed to ask the State's witnesses if they had any pending criminal charges. "As a prerequisite for the granting of a motion for a new trial, a defendant must establish that he has suffered some injustice. C.Cr.P. 851." *State v. Burrell*, 561 So.2d 692, 701 (La.1990), *cert. denied*, 498 U.S. 1074, 111 S.Ct. 799 (1991).

> The denial of a motion for new trial is not subject to appellate review except for an error of law. La.C.Cr.P. art. 858. Further, the ruling on a motion for a new trial is committed to the sound discretion of the trial judge and will not be disturbed on appeal absent a clear showing of abuse of that discretion. *State v. Gerard*, 96-366

17

> (La.App. 5 Cir. 11/14/96), 685 So.2d 253, 260. The merits of a motion for new trial must be viewed with extreme caution in the interest of preserving the finality of judgments. *State v. Rodriguez*, 02-334 (La.App. 5 Cir. 1/14/03), 839 So.2d 106, 133, *writ denied*, 03-0482 (La.5/30/03), 845 So.2d 1061, *cert. denied*, 540 U.S. 972, 124 S.Ct. 444, 157 L.Ed.2d 321 (2003).

*State v. Bibbins*, 13-875, p. 20 (La.App. 5 Cir. 4/9/14), 140 So.3d 153, 167.

Defense counsel filed a motion for new trial on July 1, 2013, asserting that the trial court had closed the door on examination concerning pending charges during Fontenot's testimony, thus precluding him from inquiring about possible deals with Fontenot and the three witnesses who followed, Rita Labbe, Luke Gonzales, and Robert Kibodeaux. He asserted that Kibodeaux had an extensive criminal history with pending charges, and he attached Kibodeaux's rap sheet.

Twelve days later, defense counsel filed another motion for new trial asserting that Brady Fuselier had pending charges and gave perjured testimony. He asserted that Fuselier had theft, disturbing the peace, and trespass charges pending; and that Kibodeaux had open charges for worthless checks, theft, aggravated assault, simple battery, and disturbing the peace. He further indicated that Gonzales had two disturbing the peace charges in 2012, and that Labbe had a charge for theft from 2011. Defense counsel argued that there was some motive or incentive for *all* of the State's witnesses to come forward, but he did not examine them on this issue because he felt that his questions would have been met with the same objection as his questioning with Fontenot. We note that defense counsel asked Rita Labbe about her convictions, but he did not even broach the subject of inducements or deals in exchange for her testimony.

The record reveals that the trial court specifically told defense counsel that he could ask whether any deal or special consideration was given either then

18

or in the future in exchange for a witness's testimony. In fact, the witnesses who were asked about inducements, Fogleman, Fuselier, Fontenot, and Kibodeaux, all testified that they were *not* offered anything in exchange for their testimony. While Fogleman and Fuselier testified that they were not offered any deals, they were not even asked about pending charges, and they testified before Fontenot and the trial court's ruling on the issue. Defense counsel admitted that he had no proof that any deal had been made and indicated that it was a credibility call for the jury to decide whether a deal had been made.

The trial court responded that defense counsel did not follow up with questions about deals and that if he had done so and had shown that deals had been made, he would have been allowed to go into them. The trial court subsequently denied the motions for new trial, citing *State v. Williams*, 618 So.2d 606 (La.App. 2 Cir.), *writ denied*, 625 So.2d 1060 (La.1993), which the trial court found similar to this case. The trial court stated:

> The Court also notes that instructions were given on how to proceed in this matter. Counsel did not follow those instructions when we went back into open court and left the matter alone and did not pursue it and therefore the Court feels that was abandoned on that line of questioning, or any objections at that time were abandoned at that time.
>
> The Court does not find that there is any basis in the last Motion for New Trial that was filed herein, including the fact that Mr. Gonzales' record was not disclosed, again, primarily because he was never asked if he was convicted of a crime.

In *State v. Williams*, 618 So.2d 606, the case cited by the trial court, defense counsel attempted to impeach the confidential informant by showing that he cooperated with police under threat of prosecution. The trial court initially sustained the prosecution's objection to this questioning. On appeal, the second

19

circuit stated: "It is well settled that the possibility that the prosecution may have leverage over a witness due to the witness' pending criminal charges is a valid area of cross examination." *Id.* at 610. The second circuit then found that the trial court's actions, if error, were at most harmless error:

> Although the court initially sustained the state's objection to this line of questioning, the record also reveals a later colloquy on this subject between the trial court and defense counsel. In this colloquy, the court clarified its ruling. The court stated, "Now, if you want to ask him questions about motivation [for his testimony] or other proper avenues of impeaching his testimony I have not prevented you from doing that." However, defense counsel did not further pursue this line of questioning.

*Id.* at 610-11.

Here, the trial court in its *initial* ruling specifically told defense counsel that he could ask about inducements or deals offered "now or in the future," and we have found that the admonishment not to mention the words *pending charges* was harmless error when applying the *Van Arsdall* criteria to the testimony in this case. Fontenot was asked repeatedly, without objection, about his criminal record, including whether he had asked about deals with police officers, detectives, and attorneys, whether he had received any deals, and whether he knew anything about a reward. He admitted that he had asked for help but testified that he was refused any deal, answering the question in the negative eleven times. The other witnesses were not asked about pending charges. Some were not even asked about deals or inducements. These omissions cannot be attributed to the trial court's instruction.

Moreover, at the hearing on the motions for new trial, defense counsel discussed what charges he believed certain witnesses had pending at the time of

trial, but he did not call those witnesses to testify at the hearing. While documents from open file discovery were introduced in an exhibit consisting of over 1,250 pages, neither trial counsel nor appellate counsel pointed to specific pages that prove the witnesses at issue had pending charges that could have been connected to their trial testimony. Some of the charges discussed at the hearing dated back to 1998, and the trial was in 2013.

In order to obtain a new trial, the defendant must show that an injustice has been done, and Mr. Gautreaux has failed to do so in this case. *See* La.Code Crim. art. 851; La.Code Crim.P. art. 921. A defendant's mere speculation about a deal is not sufficient for obtaining a new trial. *Cf. State v. Anderson*, 390 So.2d 878 (La.1980). We find no error in the trial court's denial of the defendant's motions for new trial.

IV.

**CONCLUSION**

Based upon the foregoing, the convictions and sentences of Warren Ray Gautreaux, on two counts of first degree murder, are affirmed.

**AFFIRMED**.

21